## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CYNTHIA LOPEZ,

                Plaintiff,

v.                                      ACTION NO. 2:17cv260

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Cynthia Lopez ("Lopez") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 7. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Lopez's motion for summary judgment (ECF No. 11) be **GRANTED in part** and **DENIED in part** and that the Commissioner's motion for summary judgment (ECF No. 13) be **DENIED**.

## I. PROCEDURAL BACKGROUND

Plaintiff, Cynthia Carlota Lopez, protectively filed an application for a period of disability and DIB on December 5, 2012, alleging that she became disabled on May 29, 2012,

due to vertigo, dizziness, balance issues, and migraine headaches.[1] R. 9, 56–57, 158. SSA denied Lopez's application on September 9, 2013, and, upon reconsideration, on December 5, 2013. R. 98–100, 104–06. An Administrative Law Judge ("ALJ") heard the matter on July 14, 2015, and received testimony from Lopez (who was assisted by a non-attorney representative) and an impartial vocational expert. R. 23, 25–45. On August 5, 2015, the ALJ denied Lopez's claim, finding that she was not disabled from May 29, 2012 through the date of the decision. R. 9–16.

On March 10, 2017, the Appeals Council denied Lopez's request for review of the ALJ's decision. R. 1–3. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981. Having exhausted all administrative remedies, Lopez filed a complaint with this Court on May 15, 2017. ECF No. 1. The Commissioner answered on July 13, 2017. ECF No. 5. In response to the Court's order, Lopez and the Commissioner filed motions for summary judgment, with supporting memoranda, on August 15 and September 13, 2017, respectively. ECF Nos. 11–14. Lopez filed a brief replying to the Commissioner's filing on October 3, 2017. ECF No. 15. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II. **RELEVANT FACTUAL BACKGROUND**

### A. *Background Information and Hearing Testimony by Cynthia Lopez*

Born in 1959, Lopez was 52 years old as of the alleged onset date of disability of May 29, 2012. R. 26, 158. After completing high school, Lopez attended one year of college. R. 26, 196. Before she stopped working on May 29, 2012, Lopez held positions in customer service for

---

[1] Page citations are to the administrative record that the Commissioner previously filed with the Court.

a medical insurance company and a catalog sales firm and worked as a telephonic sales representative.  R. 26, 28–29, 196, 203, 255.

At the July 14, 2015 hearing before the ALJ, Lopez testified that she is married and lives with her husband, who works out of town during the week and returns to their residence on Fridays.  R. 31–32.  At the start of the hearing, Lopez's representative identified her "primary impairment as vertigo."  R. 26 (noting also that there is "way more to this case than vertigo"). Lopez testified that she suffers from vertigo, dizziness, balance issues, migraine headaches, and diabetes.  R. 26–27, 29, 31, 35.

For the vertigo and related conditions, Lopez testified that she wears sunglasses all the time and at home (and did so at the hearing) because "the glare affects [her] sight."  R. 36.  To treat the vertigo, Lopez testified that she follows her providers' directives to use a cane for walking and performs "visual and motion [exercises, such as] climbing stairs and walking."  R. 30, 35–36.  She also reported taking medication for vertigo and stated that "[s]ometimes I think it's a placebo . . . but sometime[s] it doesn't work for the most part."  R. 35.  Lopez also testified to having migraine headaches on almost a daily basis (five to six times per week) and, when experiencing a severe headache, needing to lay down for about half of a day.  R. 40–41.  Lopez further testified to taking medication for type 2 diabetes and that her blood sugar is "off and on." R. 31.  With respect to back issues, Lopez indicated that she had previously been treated for the same, but her representative advised that Lopez was not asserting that as one of her "primary . . . disabling conditions."  R. 42.

With respect to daily life, Lopez testified that, while she tries to cook for herself, she cannot perform housework and her husband takes care of the same when he returns on the

weekends.[2]  R. 31–32.  Lopez testified that she is able to dress and bathe herself, but doing so takes "forever," and that she is often assisted with these tasks by her husband or a friend.  R. 34. Initially, Lopez testified that she could walk one block, R. 34, but later revised this estimate by stating that she could walk half a block and then return and sometimes needed assistance doing so, R. 39.  When she goes shopping, Lopez testified that a friend takes her to get her out of the house or she goes with her husband and pushes the cart to exercise and improve her walking ability.  R. 32–33.  Although licensed to drive, Lopez testified that she has not done so since the onset of her disability.  R. 33.  She reported socializing with others at church, but indicated that her conditions have limited her ability to do so.  R. 33–34.  Lopez testified that she could sit for roughly an hour or two and the most she could carry was a half-gallon of milk.  R. 34.  Lopez testified that, because she does not see well due to vertigo, she neither watches television nor reads papers and books and "hardly ever" uses a computer.  R. 36–38.  Nevertheless, she performs brain tests on her phone, as recommended by her doctor.  R. 37–38.  Lopez testified that she is very emotional, has difficulty sleeping, is prone to crying, and suffers from memory deficits, which she combats by writing notes.  R. 41.  Finally, Lopez also reported that her hands shake and her knee sometimes "folds up for no reason" while walking.  R. 38.

In adult function reports dated August 15 and November 20, 2013, Lopez noted similar limitations.  R. 213–34.  Lopez reported that, prior to onset, she possessed the ability "to work, travel and take walks."  R. 213, 226.  Post-onset, Lopez reported being sensitive to light, sound, and movement and spending days at home in her "bedroom or on the couch with the shades pulled and in the quiet," when not engaged in personal hygiene, eating, or sleeping.  R. 213, 217, 226, 230.  To deal with difficulties in standing, bending, and reaching, Lopez reported placing

---

[2] Lopez also testified that she "probably cook[s] if [her] husband is at home."  R. 32.

4

her hands on nearby surfaces and using a cane (prescribed to her in mid-2012) on a daily basis. R. 214, 220, 227, 233. She also advised that, due to such difficulties and a lack of motivation, she has simplified or reduced her bathing, dressing, eating, and hygiene routines, and does not perform household chores. R. 214–15, 227–28 (noting decreased appetite and, at most, the preparation of simple meals and sandwiches). Lopez further advised that she does not "drive due to dizziness and headaches/sensitivity to sunlight and headlights," and relied on others for transportation. R. 216, 229. While reporting that she could pay bills and handle financial transactions, Lopez indicated that her husband performs such tasks because she has "trouble concentrating [and] trouble writing and handling money physically." R. 217, 230. Lopez reported experiencing the following symptoms: "dizziness; nausea; poor balance; migraine[] headaches (with sensitivity to light and sound, increased nausea, blurred vision); pain, tingling and weakness in [her] hands; trouble concentrating, remembering, motivating;" fatigue; and difficulty in managing stress and changes in routine. R. 218, 220, 231, 233. Due to these symptoms, Lopez reported being limited in and or having difficulties in all kinds of exertional (sitting, standing, walking, lifting, etc.) and non-exertional activities (understanding, remembering, concentrating, seeing, hearing, completing tasks, etc.), other than talking and getting along with others. R. 218–19, 231–32.

**B.      *Relevant Medical Record***

### 1.      *Records Pertaining to Lopez's Vertigo, Headaches, And Related Conditions*

On May 30, 2012, Saunora Prom, D.O., a primary care practitioner, treated Lopez for complaints of dizziness and nausea that began four days earlier. R. 390. Following examination, Dr. Prom assessed that Lopez suffered from benign positional vertigo, prescribed meclizine as treatment, and noted a possible need for future vestibular rehabilitation. *Id.* When Lopez

returned on June 4, 2012, she was treated by Dr. Prom's partner, Cynthia Romero, M.D., and reported decreasing nausea, continued dizziness, and said that the medicine "helped a little." R. 388. Dr. Romero ordered, among other things, a "head CT" exam and referred her to an ear, nose, and throat specialist. R. 389.

On June 6, 2012, David Leonard, M.D, an ear, nose, and throat specialist, treated Lopez for intermittent dizziness of recent origin. R. 280. Lopez characterized the episodes "as a feeling in the head, giddiness, imbalance, lightheadedness, spinning . . . [,] and unsteadiness," with associated symptoms of "loss of balance, nausea, and vomiting (initially)." *Id.* Dr. Leonard reviewed Lopez's systems, conducted a physical examination and noted Lopez exhibited hearing within a normal threshold, assessed "vertigo, peripheral, unspecified" and "abnormal auditory perception NOS," and ordered testing and a follow-up appointment. R. 281–82.

On June 26, 2012, Lopez returned to Dr. Leonard, who noted that: (1) videonystagmography ("VNG") testing revealed a benign paroxysmal position vertigo ("BPPV") of the right posterior semicircular canal; (2) audio brainstem response ("ABR") testing "revealed an abnormal exam" (prolonged response in both ears); and (3) "[t]he testing was compatible with a BPPV" and added such to his prior assessment.[3]   R. 277–79, 296, 299. Dr. Leonard recommended an MRI, which took place on July 3, 2012.[4]  R. 260–61. The MRI revealed "[n]o evidence of vestibular schwannoma or other mass or enhancement [associated with the internal auditory canals ("IACs") and n]o evidence of acute or other significant intracranial finding." R. 260–61. During a July 11, 2012 follow-up appointment, Lopez reported that her dizziness had been "improving (60%)" and, after reviewing the MRI results, Dr. Leonard directed her to return

---

[3] A comprehensive hearing test the same month was normal. R. 284

[4] The CT scan conducted on June 11, 2012, led to no significant findings. R. 261–62.

in two months and referred her for a neurological/otolaryngology consultation.  R. 274–76. Lopez's condition remained the same when she next saw Dr. Leonard on September 12, 2012, except she complained about headaches.  R. 271–73.

On June 22, 2012, Lopez was treated by Dr. Prom and, at that time, was not experiencing dizziness, nausea, or vomiting.  R. 387.  The treatment notes, however, indicate that Lopez continued to experience vertigo and was taking Valium.  *Id.*  Dr. Prom's assessment included a referral for vestibular therapy and noted uncertainty about when Lopez could return to work and indicated he would complete short-term disability paperwork.  *Id.*

From July 3, 2012 through October 18, 2012, Lopez received vestibular physical therapy at the Sentara Princess Anne Therapy Center.  R. 331–55.  During the initial examination on July 3, 2012, the physical therapist noted that Lopez was a fair candidate for vestibular rehabilitation and balance training, but presented with a "normal vestibular examination and appears to have inconsistent subjective complaints."  R. 354 (noting barriers to treatment included "[p]ossible malingering").  *Id.*  On July 11, 2012, Lopez presented with a dizziness rating of 6 out of 10, reported some improvement, and stated she had performed assigned home motion sensitivity exercises.  R. 345–46.  The physical therapist noted that Lopez moaned and complained of dizziness with body position changes "that do not change the position of the head in a way that would affect the vestibular system."  R. 347.  On July 26, 2012, Lopez's dizziness rating was 7– 7.5 out of 10.  R. 342.  She tolerated head movements and other activities without increased dizziness, reported increased dizziness with other exercises, but returned to her baseline more quickly.  R. 343.  On July 31, 2012, although Lopez reported improvement (in dizziness intensity but not frequency), the therapist noted that her "dizziness levels and functional abilities [were] unchanged" and rated the dizziness at 8 out 10.  R. 339–40.  After an August 9, 2012

7

appointment, Lopez was discharged from therapy due to a lack of progress, aside from her home exercise program.[5] R. 337–38. At this session, Lopez reported that she "still [was] not driving," had dizziness ratings of 7 or 8 out of 10 with home exercises, experienced 1 episode of vertigo per hour with an intensity score of 6 to 8 out of 10, felt "'wobbly'" when walking, and had a headache (with continuing sensitivity to light) since July 20, 2012. R. 337.

On August 8, 2012, Lopez told Dr. Prom her vertigo symptoms remained about the same and that, for the preceding two weeks, she had been experiencing headaches with constant pain, from the back of her head extending to her temporal region. R. 383. Noting numerous "multiple tender points" along Lopez's cervical, thoracic, and paraspinal areas, Dr. Prom assessed that the headaches were "more muscle [than] skeletal in nature [and the] . . . tender points . . . can't reproduce the headaches."[6] *Id.* Dr. Prom also noted that Lopez denied any vision changes and had been using "her cane a great deal with her right arm." *Id.*; *see also* R. 379 (noting that Lopez "started using cane to walk" in June 2012).

On August 30, 2012, Amelito Malapira, M.D., a neurologist with Sentara Neurology Specialists examined Lopez. R. 362–66. During the exam, Lopez reported that turning to the right, changing positions, and moving about triggered daily episodes of vertigo, of varying intensity, that lasted roughly one to two minutes. R. 363. Lopez advised these episodes

---

[5] Lopez returned for another physical therapy appointment on October 18, 2012. R. 331–33. During this visit, Lopez continued to report that she remained "unable to work, unable to drive, [had] difficulty in busy places[,] and unsteadiness with ambulation." R. 332. She reported a dizziness rating of 9 out of 10 and a pain rating of 10 out 10 due to a headache. R. 332. While assessing Lopez's strength, the therapist noted "cog-wheeling" and stated that it indicated that Lopez "may not be giving full effort." R. 332. Noting the "[c]hronicity and intensity [of Lopez's] symptoms," and the absence of any change in her functional abilities, the therapist advised that she was "not a candidate for skilled physical therapy at this time." R. 333.

[6] When next seen on August 29, 2012, Lopez complained to Dr. Prom that the headaches began "in the posterior portion of her neck and radiate[d] to her temples. R. 382.

8

prevented her from engaging in her usual activities and, when severe, led to nausea and occasional vomiting. *Id.* With respect to treatment, Lopez indicated vestibular therapy "helped for a little bit" and reduced the severity of the vertigo, that the Epley maneuver offered only temporary relief, that her meclizine prescription was not helpful, and that Ativan only made her sleep. *Id.* Lopez also complained of recurring and lingering headaches, of fluctuating intensity, since July 2012, which the taking of ibuprofen failed to resolve. *Id.*

Dr. Malapira noted that, although Lopez exhibited good motor strength in her upper and lower extremities and no tremors or abnormal involuntary movements, she used a cane and walked slowly as any movement precipitated vertigo. R. 366. Dr. Malapira assessed Lopez as having persistent, recurrent vertigo of uncertain etiology and chronic, tension-type headaches. R. 362. Dr. Malapira recommended a short course of prednisone, the use of Elavil, review of the MRI and ABR report by a neuroradiologist, possible evaluation by a neurosurgeon, and that Lopez return in two months or earlier as needed. *Id.*

On October 30, 2012, Lopez returned and received treatment from Sidney Jackler, a physician's assistant ("PA"), as well as Dr. Malapira. R. 356–62. PA Jackler's notes indicate that the prior treatment ("steroids, meclizine, Ativan") had "failed" and the use of Elavil met with mixed results. R. 358. Lopez reported continuing vertigo, typically followed by throbbing headaches (10 out of 10 on the pain scale), with radiating muscle pain and some associated mild photophobia. *Id.* Lopez also reported dizziness while seated at the doctor's office and continued difficulties with sleeping. *Id.* A review of systems and accompanying physical and mental examinations revealed mostly normal findings, except for photophobia, nausea, constipation, environmental allergies, insomnia, joint pain, myalgias, neck pain, headaches, tinnitus, and a perturbed affect. R. 360–61. With respect to gait, the notes reflect that Lopez needed help

getting to her feet, complained of dizziness upon doing so, and used a cane and held the examiner's arm when ambulating. R. 361. The notes also reflect, however, that when leaving the office, Lopez got up without assistance and walked with the cane, without need of further assistance, and that she walked in a straight line without deviating to one side or the other. *Id.* During the visit, the providers told Lopez that diagnostic testing for vertigo was essentially negative and Dr. Malapira also stated that, after consulting with a neuroradiologist, he learned that "the proximity of vasculature . . . [in relation] to her 8th cranial nerve [as shown on the MRI] . . . would not be causing [her] symptoms[]." R. 357. After consulting with Lopez, the providers elected to "try symptomatic treatment of [her] other issues," rather than making multiple medication changes, wrote a Zanaflex prescription to aid with sleeping, and directed continued use of Elavil. *Id.* (noting Lopez was also told she could seek a second opinion).

On November 15, 2012, Dr. Prom again treated Lopez for complaints of vertigo and headaches. R. 381. Dr. Prom made three trigger point injections of lidocaine in the vicinity of Lopez's trapezius, rhomboids, and thoracic paraspinals and also performed dry needling at each injection site, "to treat the headaches [and] . . . help out with [the] dizziness." *Id.*

On February 1, 2013, Lopez returned to Sentara Neurology Specialists and was seen by PA Jackler, who noted that her condition and symptoms remained essentially the same. R. 655–56. During the physical examination, PA Jackler noted that Lopez complained of "intense pain" when touched and exhibited shaking in both lower extremities, which shaking "spontaneously stopped" when Lopez was distracted. R. 654, 658. PA Jackler also noted that Lopez ambulated without complaints about pain. R. 654. As he had done on October 30, 2012, R. 361, PA Jackler observed that Lopez exhibited greater need for assistance and cane usage during examination, compared to after examination. R. 658; *see also* R. 654 (noting question whether Lopez's

10

conditions were psychogenic in nature).  PA Jackler referred Lopez for a second opinion to the neuro-otology department at the University of Virginia, increased her dosages of Elavil and Zanaflex, and administered a Toradol injection to aid with her headache.  R. 654.

On March 7, 2013, Lopez went to the emergency room at the Sentara Princess Anne Hospital complaining of worsening dizziness/vertigo, with nausea and vomiting, and photophobia and a headache.  R. 438–41.  After being examined and treated with Phenergan and Ativan and diagnosed with vertigo, migraine headaches, and diabetes mellitus, Lopez was issued prescriptions for Antivert (meclizine), and Zofran, and directed to see her primary care provider, Dr. Romero, within two days.  R. 439–41, 444–45, 447.

On March 29, 2013, Bradley Kesser, M.D., of the University of Virginia Hospital conducted a consultative examination of Lopez for chronic imbalance.  R. 497–99.  Dr. Kesser observed that Lopez reclined in a chair, wore dark sunglasses, said that she could not sit up and that she needed him to stop talking at times in order for episodes of dizziness to pass.  R. 497.  Lopez reported constant and recurring "spinning, nausea, and headaches" for approximately one year, without hearing loss, but accompanied by high-pitched ringing in the ears, and "that light and sound seem to make the imbalance worse."  *Id.*.  After examining Lopez and noting that "patient [was] unable to open [her] eyes without glasses on," Dr. Kesser found the etiology of the dizziness to be "unclear," but opined that it was not of a "peripheral vestibular pathology."  R. 498.  To treat the dizziness symptoms, Dr. Kesser's recommendations included "fluid hydration, avoidance of salt, caffeine, and fried foods, and balance exercises."  *Id.*  Dr. Kesser also discussed using a night light, sitting on the edge of the bed before arising, and use of a "walking stick to help with ambulation."  *Id.*  Finally, Dr. Kesser wrote a prescription for Inderal.  *Id.*

On April 1 and 2, 2013, PA Jackler again treated Lopez.  R. 520–25.  At the first visit,

11

Lopez reported having the same symptoms, including blurred vision, and suffering daily headaches that lasted the entire day. R. 522. PA Jackler examined Lopez[7] and reviewed the treatment history with Lopez and her spouse and noted that Dr. Kesser's evaluation led to "no findings for [the] cause of dizziness except sleep and possible [] migraine." *Id.*; *see also* R. 521 (noting absence of "organic causation found to date" for dizziness and that provider does not "have anything else to offer" for treatment, "(save for trying to treat her migraines)"). PA Jackler also explained that the photophobia and blurred vision could stem from Lopez's migraine headaches. *Id.* PA Jackler noted his impressions as chronic migraine, myofascial pain, trouble sleeping, and dizziness and directed Lopez to continue using Zanaflex and Prinivil and to increase her dosage of Elavil. R. 521. On the second visit, PA Jackler administered greater occipital nerve ("GON") block injections to Lopez for her migraine headaches. R. 520 (noting three injections in both the right and left occiputs).

When she returned on July 11, 2013, Lopez said that the GON injections helped for only one day and Dr. Malapira found her condition remained essentially unchanged. R. 537–40. His examination found no tremors and normal motor strength, but noted that Lopez moved slowly and used a cane. R. 539. Dr. Malapira's impression reflected that Lopez suffered from a chronic daily headaches "[with] migrainous features" and "persistent dizziness/vertigo . . . [that was] unlikely to be due to migraine." *Id.* Dr. Malapira administered trigeminal nerve block ("TGN") injections, prescribed an increased dose of Amitriptyline, continued use of Zanaflex, and limiting the use of meclizine going forward. R. 539–40.

---

[7] When testing the motor strength in Lopez's lower extremities, Jackler noted "shaking" on both sides and "testing breakaway weakness suspect." R. 525. He also noted that she stood without assistance, but ambulated with a cane. R. 525.

On October 21, 2013, Lopez repeatedly requested that Sentara Neurology Specialists complete disability paperwork and was told by PA Jackler that she had "NOT [been] labeled . . . as permanently disabled, nor do we make that determination." R. 572–74. PA Jackler noted that Lopez "[s]eems to have periods of ataxia followed by ability to walk without difficulty (?)." R. 577. He treated Lopez by administering TGN injections, by increasing the Neurontin dosage, and referring her to a sleep specialist for insomnia, as a possible contributing factor to her headaches. R. 573, 577.

On December 16, 2013 and February 24, 2014, Daniel Cohen, M.D., of Sentara Neurology Specialists evaluated Lopez for a sleep disorder. R. 598–604. Lopez complained of muscle pain, migraine headaches, memory loss, weakness, and was depressed and felt anxious. R. 603. Dr. Cohen observed that she was "[p]rofound[ly] photophobic, with near constant rapid blinking even in dim light" and, upon standing, exhibited a "bouncing quality [to her legs] that improved with walking." R. 604. Following a sleep study, on February 24, 2014, Dr. Cohen assessed Lopez with a "circadian rhythm disorder – delayed sleep phase type." R. 598, 600 (also noting that Lopez "[t]ends to give evasive . . . and inconsistent [answers]" to questions about time spent in bed, exercise, daytime activities, and performance of home exercise program). To treat the disorder, Dr. Cohen instructed Lopez about "circadian entrainment" and provided written rehabilitation instructions to facilitate this, prescribed venlafaxine for depression, recommended assessment for obstructive sleep apnea, and discussed other possible testing (a spinal tap) to determine whether if there was an "underlying inflammatory cause" of her "unexplained neurological illness."[8] R. 598, 601.

---

[8] Lopez had a follow-up appointment with Dr. Cohen on September 22, 2014, and reported no change in her condition, despite following his recommendations. R. 611. After re-emphasizing the need for Lopez to make behavioral changes in regard to sleeping and discontinuing the

13

When Lopez returned to see Dr. Malapira on April 4, 2014 and presented the same problems, he continued the existing treatment, referred her to a neuropsychologist and/or psychiatrist, and suggested pursuit of other opinions for vertigo and dizziness. R. 624–29 (noting "relatively normal neurological examination and no significant objective findings on diagnostic studies and poor response to multiple treatment[s]").

On September 26, 2014 and January 7, 2015, Lopez was seen by her primary care provider, Dr. Romero and treated for, among other things, headaches, dizziness/vertigo, adult onset diabetes, adjustment disorder, and bronchitis. R. 670–91. On the first visit, Dr. Romero noted that the symptomology of the headaches (pain 9 out of 10) and vertigo were moderate and recommended that she be seen by a psychiatrist and a psychologist. R. 679. On the second visit, Dr. Romero noted that she would help Lopez obtain information about arranging an appointment with a neurologist and neuropsychologist at Johns Hopkins for headaches, dizziness, adjustment disorder with depressed mood, and neurocognitive disorder. R. 670. Dr. Romero also saw Lopez for the same conditions on April 29, 2015, as well as sleep disturbance and cataracts,[9] and noted that Lopez reported her symptomology with dizziness and headaches as being severe. R. 753–54, 759.

On March 18, 2015, neurosurgeon Ran Vijai Singh, M.D., assessed Lopez. R. 745. During the physical examination, Dr. Singh observed that Lopez was "[a]taxic" and exhibited "[b]ody bobbing movement on standing and walking." R. 747. After examining Lopez and reviewing her history, Dr. Singh's opined that Lopez had "[n]o neurosurgical issues" and

---

venlafaxine, Dr. Cohen directed Lopez to come back in six months. R. 610.

[9] On April 17, 2015, Dr. Paul Griffey at the Chesapeake Eye Care & Laser Center examined Lopez and diagnosed mild non-proliferative diabetic retinopathy and glaucoma in both eyes and prescribed Travatan. R. 762.

directed follow-up with Dr. Malapira. R. 748.

On March 24, 2015, Dr. Cohen conducted a follow-up examination of Lopez. R. 780. Dr. Cohen's assessment of Lopez's insomnia remained the same. *Id.* With respect to her neurological condition, however, Dr. Cohen noted based on his physical examination of her and the diagnostic testing that her neurological problems (photophobia, vertigo, headaches, memory changes, and orthostatic tremor) may potentially have a psychiatric etiology. *Id.* (noting that the "orthost[]atic appearing tremor stops with distracting motor tasks with the hands"). Dr. Cohen also ordered a "lumbar puncture" (spinal tap), as he previously suggested, to evaluate other causes for her condition.[10] R. 781.

On April 16, 2015, Dr. Malapira examined Lopez and found her condition unchanged and observed that her "[lower extremity] shaking . . . [was] not consistent with an orthostatic tremor." R. 792. After discussing with Lopez the limitations of available treatment options, Dr. Malapira directed that she wean herself off of Neurontin and Zanaflex and, once having done so, he would start her on Depakote. *Id.*

### 2. Records Pertaining to Lopez's Back, Shoulder, Spine, Knees, Mental Health and Related Conditions

On November 30, 2012, Lopez informed Dr. Prom that, due to dizziness, she recently fell down several steps at home and hit her right arm and hip. R. 373. X-ray revealed no fractures, but Dr. Prom observed bruising, decreased range of motion in the right shoulder, pain upon movement of the wrist and elbow, and pain in the right hip upon palpitation and directed icing the affected areas and the taking of Motrin and/or Flexeril. *Id.* In subsequent follow-up appointments, Lopez reported improvement, R. 377, but also continuing pain in the right

---

[10] Apparently, the spinal tap procedure did not occur until shortly before Lopez's hearing before the ALJ. R. 27 (reporting that Lopez had a "lumbar puncture on Friday, and a CT [s]can . . . to take fluid from [her] back" for testing).

shoulder area, which Dr. Prom treated with a steroid injection and a referral to physical therapy, R. 374–76.[11]

Following an accident involving a car in which Lopez was a passenger, on July 26, 2013 she received treatment at the emergency room at Sentara Princess Anne Hospital for a headache and pain in her neck, back, hips, and right arm/shoulder area. R. 541–66. A CT examination of Lopez's cervical, lumbar, and thoracic spine, her pelvis, and right shoulder was normal and/or negative for evidence of fractures or acute trauma, but revealed degenerative disc disease at L5–S1 (with "moderate loss of disc height"), and a probable kidney stone. R. 547, 563–65. Lopez was diagnosed with muscle and ligament strain, directed to apply ice and heat to the affected areas, and take ibuprofen, Valium, diazepam, Vicodin, and hydrocodone, as prescribed. R. 543–44, 556–59.

From August 4, 2013 through January 17, 2014, Lopez received post-accident chiropractic care from Patrick Patzer, D.C. R. 587–91. Over time and particularly beginning in October 2013, Lopez reported that the pain she experienced was improving and by January 17, 2014, the treatment provider reported that she reached maximum medical improvement from the car accident. R. 587–89. Notwithstanding this, Lopez continued to receive chiropractic treatments from January 24, 2014 through June 6, 2014. R. 772–74.

---

[11] Beginning on January 18, 2013 and continuing through March 12, 2013, and in spite of continued dizziness and occasional headaches, Lopez received physical therapy at the Sentara Princess Anne Therapy Center for right shoulder (impingement syndrome) and wrist pain. R. 455-94. On February 5, 2013, Lopez reported "several episodes of dizziness" and required hand support with position changes. R. 463 (noting therapist walked patient out to car as she was "visually unsteady," despite self-report of being "fine"); *see also* R. 485 (noting unsteadiness in Lopez's ambulation and need for assistance on February 28, 2015). After having met her short and long-term therapy goals, Lopez was successfully discharged from therapy. R. 493–94.

Upon referral from her primary care provider, on April 3, 2014, Witold Turkiewicz, M.D., of the Center for Arthritis and Rheumatic Disease evaluated Lopez who complained of knee instability[12] (starting around 11 months ago she "notic[ed] that her knees give way when she walks"), occasional low back pain, chronic shoulder and neck pain, and vertigo. R. 605. Following examination, Dr. Turkiewicz advised Dr. Romero by letter that "[t]here does not clearly appear to be an underlying inflammatory rheumatologic/systemic collagen-vascular disease process noted at this time" warranting any follow-up appointment and advised "[t]he patient will . . . speak to you regarding the possibility of an orthopedist consultation." R. 606.

On September 10, 2014, Robert Mitchell, Jr., M.D., with Dominion Psychiatric Associates began treating Lopez. R. 742–43. After noting what he described as "a rather bizarre and vague history of what initially was thought to be neurological problems," Dr. Mitchell observed that testing and evaluation led to "no determination as far as any physiological or physical symptoms or problems diagnosed to account for [Lopez's] difficulties." R. 742. Dr. Mitchell noted that Lopez was "rather vague, but presents with a history of 'vertigo'," and remarkably exhibited "strange bodily movements" during the session when standing which he described as "bounc[ing]." *Id.* Upon inquiry, Lopez explained the movement helped her to counteract dizziness and maintain balance. *Id.* Although tearful throughout the session and frustrated by the inability to get to the cause of her condition, Lopez denied being depressed. *Id.* A mental status examination revealed Lopez: (1) to be somewhat vague and evasive; (2) able to relate logically and coherently; (3) to have a dull affect and some anxiety; (4) to be likely depressed and somatically preoccupied; and (5) as having a limited fund of knowledge and information and impaired judgment. R. 743. Based on this initial evaluation, Dr. Mitchell

---

[12] Lopez stated that the knee condition predicated the referral from Dr. Romero. R. 605.

declined to venture a diagnosis, without further evaluation, therapy, and neuropsychological testing. *Id.*

Later records from Dominion Psychiatric Associates, which are both bare-bones and barely legible, suggest that Dr. Mitchell saw Lopez on three later dates for medication management. R. 735–41. A February 4, 2015 note indicates Lopez was prescribed Klonopin and has an "unspecified diagnosis." R. 739. A March 4, 2015 note lists no medications and contains a barely legible form listing the reason for the visit as "mood [illegible]," circled review of symptoms "anxiety," "depression," and "bipolar disorder." and circled diagnosis of "Bipolar Depressed Severe." R. 737–38. A March 14, 2015 note also lists no medications, with an associated form indicating the visit was prompted by worsening anxiety and listing a circled diagnosis of "Anxiety Disorder Generalized." R. 735–36.

Other treatment records also indicate that Lopez received cognitive behavioral therapy at Dominion Psychiatric from Emilio Cortes, Psy.D., on five occasions from April 26, 2014 through November 1, 2014. R. 662–68. During these appointments, mental status examinations by Dr. Cortes revealed normal findings and Dr. Cortes diagnosed Lopez with an adjustment disorder with mixed anxiety and a depressed mood. R. 662–65, 667.

On October 16, 2014, Bethany Gilstrap, Psy.D., interviewed Lopez and put her through a battery of tests as part of a neuropsychological examination. R. 617. Thereafter, Dr. Gilstrap noted the following impressions: (1) Lopez presented with neurologic complaints that appeared to be "unfounded upon workup"; (2) her test findings represent what Lopez is "minimally capable of" based upon inconsistencies observed and Lopez's nodding off at times during testing; (3) Lopez exhibited a mild neurocognitive disorder and a probable adjustment disorder with depressed mood; and (4) somatoform/conversion disorder should also be considered if

physical origins for her malaise, head pain, and neurological complaints were ruled out. R. 617–18. With respect to the mild neurocognitive disorder, Dr. Gilstrap observed deficiencies in psychomotor speed, visual attention/processing, executive function, and verbal memory. R. 716, 719. Dr. Gilstrap recommended education, psychological and/or psychiatric treatment as prescribed, use of mindfulness strategies to assist with attention/concentration and memory functions; and use of strategies for facilitating brain health (including proper diet, exercise, socialization, and mentally challenging activities). R. 618. During a psychotherapy session on December 18, 2014, Dr. Gilstrap reviewed the above-noted results with Lopez and noted her diagnostic impressions as cognitive disorder NOS, adjustment disorder with depressed mood, and possible somatoform disorder. R. 777–78.

### 3.   *Medical Source Statements*

On March 1, 2014, Dr. Malapira and PA Jackler signed a two-page form indicating that Lopez experienced severe and persistent daily headaches, received injections that were minimally effective, had been prescribed numerous medications to treat her condition, and that, due to the headaches, Lopez could not sustain competitive employment on a sustained basis for an unknown period of time. R. 596–97.

On March 5, 2014, Dr. Patzer also evaluated Lopez's physical and mental abilities. R. 582–86. As for the former, he reported: (1) that during an 8-hour work day, Lopez could stand/walk for 1 hour, but not continuously,[13] could occasionally lift/carry objects weighing 5 pounds or less, but never more, and could occasionally stoop, kneel, crouch, crawl, and reach above her shoulders, but never climb or balance; (2) Lopez could use her hands to engage in simple grasping and pushing and pulling, but could not use either hand for tasks requiring fine

---

[13] Dr. Patzer neglected to address how long Lopez could sit. R. 582.

manipulation or repetitive motions, such as typing, writing, or assembling; (3) Lopez could use neither foot for repetitive movements, such as operating foot controls; (4) she was totally restricted from unprotected heights, being around moving machinery, and operating cars, and moderately restricted from environments with marked changes in temperatures and humidity and from exposure to dusts, fumes, and gases; (5) due to photosensitivity, Lopez required assistance from others in reading and completing forms; (6) Lopez experienced disabling fatigue due to her medical conditions, "is unable to stand for any duration" and finds it "burdensome to arise from a seated position," and is unable to work full-time in a sedentary position; and (7) Lopez experiences disabling pain due to her medical conditions, which prevents her from working full-time in a sedentary position and which moderately affects her attention and concentration. R. 582–86 (noting muscle spasms and back pain and difficulty with ambulation).

### 4. State Agency Physician Reviews

On September 6, 2013, Carolina Bacani-Longa, M.D., a state agency physician, reviewed Lopez's medical records and opined: (1) that she had no exertional limitations; (2) that she had postural limitations stemming from vertigo that prevented her from climbing ladders, ropes, and scaffolds, but she could climb stairs, balance, stoop, kneel, crouch, and crawl; (3) that she had no manipulative, visual, or communicative limitations; and (4) that she had one pertinent environmental limitation that necessitated avoidance of machinery and heights. R. 61–63 (noting normal MRI and intact state of Lopez's neurological condition, the absence of muscular-skeletal dysfunction, and that vertigo was "not constant" and improved with medication).

On reconsideration, on December 3, 2013, J. Astruc, M.D., another state agency physician, also reviewed Lopez's medical records. R. 73-75. Dr. Astruc opined that, based upon the post-car accident (July 26, 2013) radiology showing degenerative disc disease that Lopez was

not only subject to the postural limitations identified by Dr. Bacani-Longa, but also certain exertional limitations. *Id.* Specifically, Dr. Astruc opined that Lopez: (1) could only occasionally lift 20 pounds and frequently lift 10 pounds; (2) could stand and/or walk about 6 hours in an 8-hour workday and sit for the same time period; and (3) had an unlimited ability to push and/or pull, subject to the weight totals noted above. R. 74. In all other respects, Dr. Astruc's opinions matched those of Dr. Bacani-Longa. R. 74–75.

## C.      *Hearing Testimony of Vocational Expert Robin Stromberg*

At the hearing before the ALJ, Robin Stromberg, a vocational expert ("VE"), identified Lopez's past work history in varying customer service positions as sedentary work, ranging from skilled to low semi-skilled labor. R. 42–43. In response to the ALJ's hypothetical question concerning the availability of jobs for a person of Lopez's age, education, and work experience, able to perform light work, without climbing or at unprotected heights or around dangerous machinery, and unable to operate a motorized conveyance or vehicle, VE Stromberg testified that such a person could perform Lopez's past relevant work as a customer service representative for a medical insurer or catalog company. R. 43–44. Alternatively, the VE also testified that other jobs, such as a general information clerk, an office helper, and cashier, existed in the national economy for a person having such a profile. R. 44. VE Stromberg also testified that maintaining employment would be precluded if the hypothetical person needed to miss several days per week due to migraine symptoms. *Id.*

## III. <u>THE ALJ's DECISION</u>

To evaluate Lopez's claim of disability,[14] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See*

---

[14] To qualify for DIB, an individual must meet the insured status requirements of the Social

20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether Lopez: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 11–16.

The ALJ found that Lopez met the insured requirements[15] of the Social Security Act through December 31, 2017, and she had not engaged in substantial gainful activity since May 29, 2012, her alleged onset date of disability. R. 11.

At steps two and three, the ALJ found that Lopez's "vertigo/disorder of the vestibular system" constituted a severe impairment. R. 11–12. The ALJ classified Lopez's other asserted impairments—diabetes mellitus, degenerative disc disease, and psychological issues—as non-severe, because they either were of limited duration or controlled or did not require significant medical treatment or failed to result in any diagnosis or failed to impose continuous limitations on Lopez. *Id.* The ALJ further determined that Lopez's severe impairment failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.

---

Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. § 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

[15] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

1, including those identified in section 2.00 (Special Senses and Speech), as required for a finding of disability at step three. R. 12.

The ALJ next found that Lopez possessed a residual functional capacity ("RFC") to perform light work, *see* 20 C.F.R. § 404.1567(b), subject to the limitations that: (a) she "avoid climbing and work at unprotected heights or around dangerous machinery"; and (b) she not "operate a motorized conveyance or vehicle." R. 12. Based upon this RFC assessment, the ALJ determined at step four that Lopez could return to her past relevant work as a customer service representative for a catalog company or medical insurance company or telemarketer. R. 14. Finally, at step five, the ALJ also found, having considered the testimony of the vocational expert and Lopez's age, high school education, work experience, and RFC, that Lopez could also perform other jobs, such as an information clerk, an office helper, and cashier, which existed in significant numbers in the national economy. R. 15–16. Accordingly, the ALJ concluded that Lopez was not disabled from May 29, 2012 through the date of the ALJ's decision and was ineligible for a period of disability or DIB. R. 16.

## IV. **STANDARD OF REVIEW**

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere

23

scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V. ANALYSIS

*A.*     *Substantial evidence supports the ALJ's classification of Lopez's mental health impairments as non-severe. Moreover, even if such a classification error occurred, it was harmless.*

Lopez first argues that the ALJ erred in classifying her mental impairments as non-severe and that this error "caused a 'ripple effect' of errors" that led to a legally insufficient RFC finding and VE testimony improperly predicated thereon. Pl.'s Br. in Supp. of Mo. for Summ. J. ("Pl.'s Mem."), ECF No. 12 at 12–13. Lopez contends that the ALJ predicated the non-severity finding upon Dr. Mitchell's unwillingness to render a diagnosis in September 2014 and a normal mental status examination in November 2014. Pl.'s Mem. 13. Lopez argues, however, that this

24

analysis ignored Dr. Mitchell's later diagnoses of adjustment disorder, anxiety, and bipolar disorders in the spring of 2015 and other observations of Lopez as tearful, depressed, anxious, etc., with accompanying sleep, appetite, and concentration difficulties. *Id.* For the reasons discussed below, the ALJ's classification of Lopez's mental health impairments is supported by substantial evidence.

Step two of social security disability analysis examines whether a claimant suffers from a medically determinable impairment that is severe. 20 C.F.R. § 404.1520(c). By regulation, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."[16] 20 C.F.R. § 404.1522(a). "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986); *see also Little v. Colvin*, No. 6:15cv11, 2016 WL 4446325, at *4 (W.D. Va. Aug. 2, 2016). An impairment is only "not severe" if "it is a *slight abnormality* which has . . . a *minimal* effect on the individual." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

In assessing mental disorders, social security regulations direct consideration of four functional areas, commonly referred to as the "Paragraph B criteria," listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00. These criteria include (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. *Id.* If the degrees of a mental limitation in activities of daily living, social functioning, and

---

[16] Basic work activities are "the abilities and aptitudes necessary to do most jobs," which may be exertional abilities, such as walking, standing, or sitting, or non-exertional abilities, such as understanding, carrying out, and remembering simple instructions, using judgment, responding appropriately to supervision, or dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b).

concentration, persistence, and pace, are rated as "mild," and there are no extended episodes of decompensation, an ALJ will generally conclude that an impairment is non-severe, unless further evidence indicates otherwise. 20 C.F.R. § 404.1520a(d)(1).

Here, the ALJ found only Lopez's vertigo/disorder of the vestibular system ("vertigo") to be a severe impairment and classified her other alleged impairments as non-severe, due to limited duration (less than 12 months), responsiveness to medication, the absence of required significant medical treatment, or the absence of resulting continuous exertional or non-exertional functional limitations. R. 11. In so concluding, the ALJ's decision notes that: (1) in September 2014, Lopez's psychiatrist, Dr. Mitchell, declined to render a diagnosis, *Id.*; (2) in November 2014, after five psychotherapy visits in eight months, Lopez's psychologist, Dr. Cortes, found that she presented with a normal mental status examination, *Id.*; (3) in October 2014, Lopez's neuropsychologist, Dr. Gilstrap, opined that she suffered from a mild neurocognitive disorder of uncertain etiology, R. 14; (4) Lopez's activities were not as limited as expected and included activities such as daily exercise, cooking when her spouse was home, occasional grocery shopping with her spouse, and church attendance with friends, when able, *Id.*; and (5) some medical evidence indicated Lopez exhibited normal attention and concentration, *Id.* (also rejecting as unfounded claims that Lopez's pain moderately or severely affected her mental status).

Substantial evidence supports the ALJ's conclusion that Lopez's mental health impairments were non-severe. First, it is noteworthy that Lopez's disability benefits application specified her illnesses as vertigo, dizziness/balance problems, and headaches, and made no mention of mental health impairments. R. 56. Second, in the hearing before the ALJ, neither Lopez nor her representative raised any claim that she suffered from mental health impairments,

and described recent treatment consisting of visual and motion exercises, brain exercises, and a spinal tap. R. 26–42.

Third, there is more than a scintilla of evidence that Lopez's mental health conditions failed to impose continuous exertional and non-exertional limitations upon her. Although she complained of insomnia and occasionally expressed tearful frustration and/or depression about her situation to various medical providers, *see, e.g.,* R. 524, 530, 598, 600, 603, 628, 662, 664, 667, 743, 747, Lopez mostly denied suffering from mental impairments. *See, e.g.,* R. 365, 441, 530, 534–35, 620–21, 657, 689, 742–43. Due to the search for medical causes for her vertigo and headaches, and only after that search failed to yield results, Lopez began receiving mental health treatment, starting with cognitive behavioral therapy with a psychologist, Dr. Cortes, in late April 2014, nearly two years after her alleged onset date of disability. R. 667–68 (noting referrals from Lopez's neurologist and primary care provider and the absence of history for psychiatric diagnoses, medications, treatments, or hospitalizations); *but see* R. 598 (assessing circadian rhythm disorder and unexplained neurological disorder, but also prescribing venlafaxine to treat depression). Although Dr. Cortes assessed Lopez with an adjustment disorder with mixed anxiety and depressed mood, on November 1, 2014, he also reported, as noted by the ALJ, R. 12, that Lopez presented with a normal mental status examination, as she had at each of the four, preceding therapy sessions. R. 662 (reporting normal appearance, behavior, mood/affect, memory, thought process/content, judgment/insight, and intelligence, and no obsessions); *see also* R. 663–65, 667. Significantly, the record contains no further evidence of treatment from Dr. Cortes.

In an apparent search for answers, in September 2014, Dr. Cortes referred her to a psychiatrist, Dr. Mitchell, and possibly for a neuropsychological exam. R. 620 (noting

27

"[Lopez's] vague presentation with lack of reported emotional symptoms"); *but see* R. 617 (listing referral from Dr. Cohen), 733 (noting referral by Dr. Malapira).   But, as noted by the ALJ, R. 12, after meeting with Lopez on September 10, 2014, Dr. Mitchell declined to venture a diagnosis, absent further evaluation (such as neuropsychological testing) and communication with her therapist.   R. 742–43.   Next, on October 16, 2014, Dr. Gilstrap conducted the neuropsychological testing and opined only that Lopez exhibited a mild neurocognitive disorder (as noted by the ALJ), a "probable adjustment disorder," and recommended considering the need to rule out a possible somatoform/conversion disorder.   R. 617–18 (noting also that "[a]lthough no mood contribution was noted on objective inventories, she admits to sadness in relation to impact of health problems on daily function").

Notwithstanding the prompt transmission of Dr. Gilstrap's report to Dr. Mitchell's office, R. 622, months passed without him treating Lopez or rendering a diagnosis.   Instead, beginning nearly five months after Lopez was initially seen by Dr. Mitchell, she appears to have returned for treatment on February 4, March 4, and March 14, 2015.   R. 735–40.   In barely legible forms entitled "Medication Management" and mostly lacking details other than some circled words, it appears that Dr. Mitchell:   (1) made no diagnosis on February 4, 2015, but prescribed Klonopin for Lopez;[17] (2) then on March 4, 2015 found moderate and/or severe symptoms of anxiety, depression, and impaired cognitive function and diagnosed "Bipolar Depressed Severe"; and (3) on March 14, 2015, found moderate and/or severe anxiety symptoms and diagnosed "Anxiety

---

[17] Lopez argues that, in fact, Dr. Mitchell "diagnosed her with adjustment disorder with mixed anxiety and depressed mood in February 2015," Pl.'s Mem. 13., apparently solely based upon the notation "309.28" on the otherwise blank medication management form for that treatment date. R. 740. The Court rejects such a claim in the absence of any other information on the medication management form, including a signature or initials, and because the accompanying "encounter" form typed on Dr. Mitchell's letterhead and signed by him dated February 4, 2015, under "Assessments & Plan" contains the words "Unspecified Diagnosis."  R. 739.

Disorder Generalized" (but not bipolar disorder). R. 735–40. There is no additional evidence of subsequent treatment by Dr. Mitchell, Dr. Cortes, or Dr. Gilstrap.

Although Lopez correctly notes that the ALJ's decision fails to address Lopez's apparent, last three visits with Dr. Mitchell, and Dr. Cortes' diagnosis of an adjustment disorder, Pl.'s Mem. 13–14, sufficient evidence supports the ALJ's conclusion that the record fails to show that Lopez's mental health conditions imposed continuous exertional and non-exertional limitations upon her. R. 11. This conclusion is supported by the late and sporadic record of Lopez's treatment for mental health impairments. Further, it is also justified by the uncertain, at best, and contradictory nature of such impairments, which is evidenced by Dr. Gilstrap's characterization of them as mild and neurocognitive in nature, by Dr. Cortes' finding of normal mental status and by his referral of Lopez to other providers for evaluation, and by Dr. Mitchell's inability to specify a diagnosis on the first two occasions when treating Lopez and his subsequent specification, without any supporting and evaluative details, of alternate diagnoses on his final two meetings with her. Also, notwithstanding the nature of Lopez's conditions, the ALJ noted that she engaged in activities of daily living, including exercising, cooking, and grocery shopping, retained sufficient social function to attend church with friends, and that one of her medical examinations revealed normal attention and concentration abilities. R. 14. Nor does the record contain evidence of episodes of decompensation. In view of the foregoing and for the reasons noted above, the mostly illegible and conclusory records upon which Lopez primarily relies, do not suffice to establish that the ALJ erred in classifying her mental impairments as non-severe.

Moreover, if such an error occurred, it was harmless primarily for the reasons noted above. By regulation, the RFC determination and the severity determination at step two are

wholly separate.  In formulating a claimant's RFC, an ALJ considers both severe *and* non-severe impairments.  20 C.F.R. § 404.1545(a)(2); Social Security Ruling ("SSR") 96-8P, 61 Fed. Reg. 34474, 34475, 34478, 1996 WL 374184, at *5 (July 2, 1996).  While the Fourth Circuit has yet to address whether an ALJ's failure to find an impairment severe at step two of the evaluation process constitutes reversible error when that impairment is properly considered in subsequent steps, other courts, including this one, have found such errors to be harmless.  *See Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) ("the finding of any severe impairment, whether or not it results from a single severe impairment or a combination of impairments that together qualify as 'severe,' is enough to satisfy step two"); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008) ("Once the ALJ finds that the claimant has *any* severe impairment, he has satisfied the analysis for purposes of step two.  His failure to find that additional alleged impairments are also severe is not in itself cause for reversal."); *L.H. v. Colvin*, No. 2:15cv382, 2016 WL 3883030, at *11 (E.D. Va. June 21, 2016) ("The error . . . is harmless . . . because the ALJ found another severe impairment . . . , moved onto the next step in the disability analysis, and considered [the non-severe impairment] as part of his analysis in step three."); *Taylor v. Astrue*, No. 7:11cv162, 2012 WL 3637254, at *4 (E.D.N.C. Aug. 1, 2012) (explaining that any error in failing to classify an impairment as "severe" is "'legally irrelevant' as the ALJ specifically found Claimant satisfied the severity requirement at step two of the sequential evaluation process").

Here, the ALJ found the Lopez suffered from a severe impairment (vertigo) and, in moving beyond step two and in evaluating her RFC, considered and reviewed the extensive effort to find causes for her symptoms, including treatment by a psychiatrist, a psychologist, and a neuropsychologist.  In doing so, the ALJ paid particular attention to the latter's report, which

came at the request of the psychologist and whose results the psychiatrist sought to review before rendering a diagnosis. R. 14. Having exposed Lopez to a battery of tests, Dr. Gilstrap only definitively opined that Lopez suffered from a "[m]ild neurocognitive disorder" and also observed that, due to inconsistent test results and the fact that Lopez dozed at times during testing, "the findings should be considered what she is minimally capable of." R. 617; *see also* 620 (discussing also that Lopez reported sleep difficulties, appetite loss, and occasional sadness about her situation and her reduced ability to engage in past activities, but noting the absence of generalized anxiety, psychotic symptoms, hopelessness, or suicidal ideations). Similarly, the ALJ noted that Lopez complained, among other symptoms, about memory problems, but found that the record failed to support Lopez's claims that her symptoms were disabling. R. 13 (discussing apparent exaggeration of symptoms and effort by Lopez to have provider classify her as permanently disabled). Even in the absence of any effort by Lopez to advocate for any mental health impairments during the hearing, the ALJ found that Lopez's "statements about the intensity, persistence, and limiting effects of [her] symptoms [were] not entirely credible." R. 13, 26–42; *see Bryant v. Colvin*, No. 3:13cv349, 2014 WL 896983, at *12 (E.D. Va. Mar. 6, 2014) (noting that a claimant's RFC need only include limitations that are "credibly established"). For these reasons, and even if one considers the diagnoses of Drs. Cortes and Mitchell, the error asserted by Lopez was harmless because the limited and sporadic mental health treatment records fail to support the addition of other limitations in the ALJ's RFC determination and his subsequent hypothetical to the VE.[18]

---

[18] Further, because the ALJ relied upon the VE's testimony in determining whether Lopez could transition to other jobs, in addition to performing her past relevant work, the Court rejects Lopez's claim that the ALJ's grid determination, coupled with Lopez's status as a claimant of advanced age at the time of decision, compelled a disability finding and forecloses a finding of harmless error. Pl.'s Mem. 15 n.1. Although referencing the Medical-Vocational Guidelines

**B.**      ***The ALJ erred in failing to discuss Lopez's migraine headaches as a severe
         impairment and in failing to later address any limitations resulting therefrom.***

Lopez's second challenge to the ALJ's decision concerns its treatment of her migraine

headaches.  Lopez contends that the ALJ committed clear error by failing to discuss her migraine

headaches "at all" and also necessarily failing to account for them in assessing Lopez's RFC.

Pl.'s Mem. 15–16.

As discussed above, at step two the ALJ determined that Lopez had a single, severe

impairment, and nowhere addressed Lopez's headaches in classifying and/or discussing other

potential impairments.   R. 11–12.    Having failed to classify the headaches as a severe

impairment, at step three the ALJ also did not compare whether such impairment (alone or in

combination with others) met or medically equaled a listing. R. 12; *see Johnson v. Berryhill*, No.

2:17-cv-01608, 2018 WL 1096463, at *13–14 (S.D.W. Va. Feb. 1, 2018) (noting absence of

listing for headaches, but that Social Security Program Operations Manual System DI

24505.015(B)(7)(b) and SSA's National Q & A 09-036 identify Listing 11.03 as most analogous

for consideration of medical equivalence).  In assessing Lopez's RFC, however, the ALJ noted

her complaints of severe headaches/daily migraines, her sensitivity to light and associated vision

difficulties, and the fact that headaches were of extended duration and accompanied her

complaints of vertigo.  R. 13.  As noted above, the ALJ also discussed reasons for discounting

her credibility, but in doing so mostly discussed the results of the testing and treatment for

vertigo, including some improvement in that condition, observations about her walking abilities,

and how neurological evaluation and testing failed to identify any explanation for her vertigo and

---

("grids"), *see* 20 C.F.R. Part 404, Subpt. P, App'x 2, the ALJ did not rely upon them and did not
determine whether Lopez's past job skills were, in fact, transferable.  R. 15.  In light of Lopez's
status as a claimant of advanced age and to facilitate any possible need for future judicial review,
the ALJ would do well to clarify this issue upon remand.

associated conditions. R. 13–14 (also discussing that the neuropsychologist indicated that other complaints of "chronic photobia and . . . headaches have been unfounded neurologically"). After reciting Lopez's activities of daily living, discounting the opinion evidence of Drs. Patzer and Malapira (assigned light weight), and giving moderate and significant weight, respectively, to the opinions of the state agency physicians at the initial and reconsideration levels, the ALJ indicated that a "limited light residual functional capacity is supported by the claimant's vertigo and degenerative disc disease." R. 14. Thus, the ALJ did not include any limitations associated with Lopez's headaches in the RFC.

With respect to the alleged step two error, the Commissioner argues that because the record fails to establish a medical basis for Lopez's headaches and associated photophobia, substantial evidence supports the ALJ's decision to classify them as non-severe. Mem. in Supp. of Def.'s Mot. for Summ. J. and In Opp. to Pl.'s Mot. for Summ. J., ECF No. 14 at 19. This argument fails to distinguish between the *existence* of Lopez's headaches and photophobia (as documented by any recorded symptoms and a treatment record) and the *finding* of any cause for the same. This distinction is important, as other courts have recognized, "because laboratory tests cannot prove" the existence of migraine headaches. *Parsley v. Astrue*, No. 2:08cv1227, 2009 WL 1940365, at *4 (W.D. Pa. July 2, 2009); *see also McCormick v. Sec'y of Health and Human Serv.*, 861 F.2d 998, 1000 (6th Cir. 1988) (finding plaintiff suffered from migraines in spite of normal brain scan); *Abbruzzese v. Astrue*, No. 10-705, 2010 WL 5140615, at *7 (W.D. Pa. Dec. 9, 2010) (rejecting ALJ's reliance upon lack of objective evidence to support claim of migraines where record established existence of daily headaches, including serious ones three to four times a week, with nausea, photophobia, vomiting, lightheadedness, and phonophobia).

The record reflects that, a couple months after she reported developing vertigo, Lopez began complaining to providers about daily, recurring headaches, nausea, and sensitivity to light (photophobia) and occasionally sound, which the taking of ibuprofen failed to resolve. R. 358, 363, 381, 383, 497, 522, 527, 573–74, 603, 625, 655, 679, 781, 787. On one occasion, due in part to headaches, nausea, vomiting, and photophobia, Lopez received treatment at a hospital emergency room. R. 438–39, 441. Examinations regularly revealed Lopez was positive for photophobia. R. 360–61, 441, 497, 576, 604, 657, 679, 783. And, treatment providers diagnosed her as having migraines and/or chronic headaches with migrainous features. R. 439, 521, 539, 572, 596, 792. To attempt to treat this condition, Lopez received multiple nerve block and other injections from her neurology and other providers, which generally provided minimal relief. R. 381, 445, 520, 540–41, 573, 574, 577, 654, 788. She also was prescribed other medications to treat headaches, including Flexeril, Inderal, and Depakote. R. 257, 498, 690. Consistent with the absence of record evidence showing that these treatments resolved or mitigated her headaches, Lopez regularly reported to providers that she dealt with them by lying down and trying to sleep. *See, e.g.,* R. 625, 787.

This backdrop shows that the ALJ erred in apparently concluding that the absence of neurological findings, directed primarily to the cause of Lopez's vertigo (and, to a lesser degree, her headaches), meant that her headaches were not a severe impairment. This error is confirmed by treatment records from Sentara Neurology Specialists stating "that [her] dizziness could be [due to] migraine, but there has not been any organic causation found to date . . . [and explaining that] the photophobia and blurred vision can be a sign of migraine," and the remaining option is to "try[ing] to treat her migraines." R. 521. The conclusion that Lopez's headaches constituted a

severe impairment is also supported by the conclusions of both state agency physicians, each of whom classified Lopez's migraines as a severe impairment. R. 60, 72.

A similar error likewise plagues the ALJ's assessment of whether Lopez's headaches and associated conditions eroded her RFC. The RFC is a claimant's maximum ability to work despite her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform her past relevant work. *Id.* at § 404.1545(a)(5). The determination of RFC is based upon a consideration of all the relevant medical and other evidence in the record. *Id.* at § 404.1545(a)(3).[19]

While broadly concluding that "[e]xaminations . . . reveal[ed] no foundation for the claimant's complaints" and that her "complaints [were] . . . unfounded neurologically," the ALJ relied upon and recited at length treatment history primarily concerned with whether a neurological basis could be found to substantiate Lopez's vertigo. R. 13–15; *cf. Strickland v. Barnhart*, 107 F. App'x 685, 689 (7th Cir. 2004) (noting that "nothing in the record suggests [neurological] tests can confirm either the existence of migraines or their likely severity"); *Moss v. Berryhill*, No. 2:16-cv-05016, 2017 WL 4296637, at *21 (S.D.W. Va. Apr. 27, 2017), *report and recommendation adopted*, 2017 WL 4294206 (S.D.W. Va. Sept. 27, 2017) (finding the ALJ incorrectly discounted a claimant's credibility regarding claimed migraine headaches because a brain MRI was normal). Curiously, while generally finding Lopez's complaints about the limiting effects of her conditions and symptoms *not entirely credible*, the ALJ's ensuing discussion essentially ignored Lopez's headaches and their effect upon her ability to work and,

---

[19] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(c)(3).

by omission, arguably suggests he found them to be *wholly incredible*. R. 13. If so, the ALJ must say so and specify supporting reasons. Absent evaluation, for example, about the ALJ's assessment of the frequency, severity, and nature of such headaches and associated symptoms, such as photophobia, and about their effect upon Lopez's ability to sustain gainful employment, the Court cannot engage in judicial review. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017) (noting that the absence of articulated findings by the ALJ rendered the "decision unreviewable").

Nor, as the Commissioner argues, does the ALJ's discussion of alleged "signs of malingering" and Lopez's activities of daily living, Pl.'s Mem. 19–21, cure this defect. With respect to the former, the most specific examples identified by the Commissioner primarily pertain, like the RFC discussion generally, to Lopez's complaints of vertigo. *See, e.g.*, R. 354 (vestibular therapy), 361 (dizziness and gait), 654 ("jiggling legs," breakaway weakness, and dizziness), 658 (dizziness and gait), 791 ("give way weakness on shoulder abduction and hip flexion," but leg tremor "not obvious today"). Absent further explanation by the ALJ, the Court declines to conclude these observations support the ALJ's decision not to address Lopez's headaches. Similarly, the ALJ's observation that Lopez occasionally performs simple exercises and cooks at home, accompanies her husband grocery shopping on weekends, and attends church when able, R. 14, is not inconsistent with claims of daily and recurring headaches and says nothing about how long Lopez can perform such activities. *See Woods v. Berryhill*, No. 17-1500, 2018 WL 1954475, at *6–7 (4th Cir. Apr. 26, 2018) (noting that in assessing credibility an ALJ must consider both the type of a claimant's activities, as well as the extent to which she can perform them) (citing *Brown v. Commissioner*, 873 F.3d 251, 263 (4th Cir. 2017)). For all these reasons, the ALJ erred in his treatment of Lopez's headaches.

C.      *The ALJ erred in evaluating Dr. Malapira's opinion.*

The errors described above also negatively impacted the ALJ's treatment of the opinion of Dr. Malapira, Lopez's treating neurologist. On March 1, 2014, both PA Jackler and Dr. Malapira, of Sentara Neurology Specialists, signed a brief medical source statement reporting that Lopez experienced severe and persistent daily headaches, received injections for them that were minimally effective, and had been prescribed numerous, specified medications to treat the same. R. 596–97. By means of a check mark next to the word "severe," they endorsed the accompanying typed statement that such "[p]recludes the attention and concentration required for even simple, unskilled work tasks." R. 596. They also checked "no" next to the question asking if the frequency and severity of the Lopez's headaches permitted her to sustain competitive employment on a continuing basis and indicated that it was unknown how many days a month Lopez would have to miss work due to her symptoms. R. 597. In response, the ALJ assigned Dr. Malapira's opinion "little weight" and stated only that Dr. Malapira's opinion concerning the "severe mental effects of pain on the claimant's ability to concentrate [is] unfounded." R. 14. In support thereof, the ALJ cited to October 21, 2013, treatment notes taken by PA Jackler indicating that, during a mental status examination, Lopez exhibited normal attention and concentration. R. 14, 576. Lopez argues that the ALJ failed to properly analyze Dr. Malapira's opinion and the Court agrees.

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions[20] of treating providers. For claims like Lopez's,

---

[20] "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." 20 C.F.R. § 404.1527(a)(1). For claims filed before March 27, 2017, an

filed before March 27, 2017,[21] a treating provider's opinion merits "controlling weight," under federal regulations and Fourth Circuit authority, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2); *see also Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p, 61 Fed. Reg. 34490, 34491, 1996 WL 374188, at *4 (July 2, 1996).

When an ALJ assigns other than controlling weight to a treating provider's opinion, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* The main factors are: (1) the examining relationship, giving more weight to sources who have examined a claimant; (2) the treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based upon the extent of the evidence presented in support of the opinion; (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527(c) (also noting ALJ's obligation to "give good reasons . . . for the weight" given to a treating source opinion); *see Brown v. Comm'r of*

---

"acceptable medical source" includes a licensed physician, but not a nurse practitioner. 20 C.F.R. § 404.1502(a)(1).

[21] On January 18, 2017, SSA promulgated a final rule that revised its medical evidence rules, including the treating physician rule, and specified that the revisions apply to claims filed on or after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017).

*Soc. Sec.,* 873 F.3d 251, 256 (4th Cir. 2017) (noting that the first two factors are "specific to treating sources," while the latter three apply to evaluating medical opinions from both treating and non-treating sources).

By regulation, the ALJ must also explain the weight assigned to *all* opinions, including treating sources, non-treating sources, state agency consultants, and other non-examining sources. 20 C.F.R. § 404.1527(c). Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain:

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. This specificity

requirement is necessary because a reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

The ALJ's conclusory assessment of Dr. Malapira's opinion is insufficient for the following reasons. First, although the Court acknowledges that the brief and conclusory nature of Dr. Malapira's medical source statement makes it problematic to assign controlling weight thereto, this does not excuse the ALJ's failure to address the substance of the opinion in accordance with the regulations and specify good reasons for any weight assignment. *See* 20 C.F.R. § 404.1527(c). Simply ascribing little weight and using the label "unfounded" is

inadequate, particularly given Dr. Malapira's status as a specialist and the fact that his practice, Sentara Neurology Specialists, treated Lopez on nine occasions from August 2012 through April 2015.  R. 356, 362, 520, 521, 537, 572, 624, 655, 786, 792 (noting status as "Diplomate, American Board of Psychiatry and Neurology" and as "Assistant Professor of Clinical Neurology, Eastern Virginia Medical School").

Second, to the extent that the Court might infer that the term "unfounded" also links back to failure of neurological testing to identify a cause for Lopez's vertigo (and secondarily her headaches), as discussed above, the absence of test findings is not inconsistent with migraine headaches.

Third, the October 21, 2013 treatment record cited by the ALJ demonstrates that migraines may be present in the absence of neurological test findings.  On that day, PA Jackler not only noted Lopez's normal attention and concentration (cited by the ALJ), R. 576, but also her report of daily headaches ("frontal radiating to parietal region") ranking 8 out of 10 on the pain scale, R. 573–74.  And, PA Jackler treated her by administering a series of nerve block injections ("Trigeminal Nerve/Temporal Auricular Nerve") at five sites on the right and left sides of Lopez's head.  R. 577.  Therefore, the very record used by the ALJ to classify Dr. Malapira's opinion as unfounded supports Dr. Malapira's opinion and contradicts the ALJ's conclusion.[22]

Fourth, the ALJ's opinion also lacks analysis of Lopez's extensive examining and treating relationship with Dr. Malapira's practice, whether the treatment records and the ongoing diagnoses of migraine and/or chronic headaches supported Dr. Malapira's opinion, whether that

---

[22] Nor do the opinions of the state agency consultants, which precede Dr. Malapira's opinion and partly precede Lopez's continuing complaints of daily, severe headaches not resolved by various injections and treatments, provide grounds to uphold the ALJ's conclusion.  Nor did the ALJ request a consultative examination in regard to the headaches.

opinion was consistent with the record and treatment records from other providers, and the significance of Dr. Malapira's status as a specialist.

For these reasons, remand is necessary for proper analysis of Dr. Malapira's opinions.

**D.     The ALJ's incorporation of vertigo-related limitations into the RFC, not including use of a cane and work breaks and rest periods, is supported by substantial evidence.**

Due to Lopez's vertigo and degenerative disc disease, the ALJ found that Lopez possessed an RFC to engage in light work, but without climbing, working at unprotected heights, and around dangerous machinery, and the operation of motorized vehicles. R. 12, 14. Lopez argues that, having classified her vertigo as a severe impairment, the ALJ erred in failing to incorporate additional restrictions into the RFC, addressing the need to recline and take breaks and to use a cane. Pl.'s Mem. 17–19. The Court rejects this claim because substantial evidence supports the ALJ's selection of vertigo-related RFC limitations.

An ALJ need only include limitations in the RFC that are "credibly established." *See Bryant*, 2014 WL 896983, at *12; *see also Gross v. Heckler*, 785 F.2d 1163, 1165 (4th Cir. 1986) (ruling that the claimant ultimately bears the burden of establishing the existence of work-preclusive limitations). Aside from Lopez's own statements, the ALJ's review of medical and other evidence failed to establish a need for the additional restrictions she posits should have been applied. The ALJ noted that, following initial testing suggesting a BPPV in Lopez's right ear canal, substantial, subsequent testing and evaluation (and second and third opinions) by neurologists, a neurosurgeon, a sleep specialist, and assorted specialists revealed "'no organic causation to her dizziness'" and that her complaints were "unfounded neurologically." R. 13–14. As further observed by the ALJ, the evidence also showed that Lopez reported some benefit from vestibular physical therapy and, soon after her initial report of vertigo, reported significant improvement. R. 13, 271 ("patient is improving (60%)"). Notwithstanding this, and as noted by

41

the ALJ, Lopez continued to complain of vertigo and pressed her treatment providers to label her as permanently disabled. R. 13.

In spite of the fact that "[e]xaminations . . . reveal[ed] no foundation for the claimant's complaints," as noted by the ALJ, *Id.*, Lopez also began using a cane and testified at the hearing that a doctor, whose name she could not recall, prescribed it for her. R. 35–36. Perhaps, to follow up on this claim, Lopez's briefing argues that Dr. Kesser, who Lopez consulted for a second opinion and saw only one time in March 2013, prescribed the cane. Pl.'s Mem. 18. To the contrary, however, Lopez began using a cane as early as June 2012, R. 379, apparently of her own accord, and Dr. Kesser's treatment notes indicate only that he "mentioned . . . use of a walking stick to help with ambulation." R. 498. Further, as noted by the ALJ, the extent of Lopez's need for assistance when walking was called into doubt by her changing walking styles during examination, as contrasted to those observed when arriving and leaving appointments. R. 13. Finally, based upon normal physical examinations and observations about Lopez's ability to walk without difficulty when not under examination, the ALJ also indicated that Dr. Patzer's opinion regarding Lopez's ability to use her feet, such as to operate foot controls, was unfounded. R. 14. In view of such evidence and the credibility issues identified by the ALJ, the Court finds substantial evidence supports the ALJ's treatment of Lopez's vertigo-related RFC limitations.

**E.**     ***The Court declines to pre-judge whether Lopez's past work history is relevant to the ALJ's assessment of her credibility upon remand.***

Finally, Lopez asserts the ALJ erred by failing to consider her good work history, prior to the onset of her impairments, in assessing her credibility. Pl.'s Mem. 25 (noting Lopez had earnings in "125 of 144 quarters from 1977 through 2012, or 31 ¼ of 36 years"); *see* R. 168. Given the prior recommended determinations, this issue need not long detain the Court because,

in re-examining the issues of migraine headaches and Dr. Malapira's opinion, the ALJ must also revisit the matter of Lopez's credibility.  Upon remand, Lopez remains free to argue that, in doing so, the ALJ should consider her work history before the alleged date of onset and any attempts to return to work, and the ALJ remains free to consider that work history, along with any other matters germane to credibility, consistent with the governing regulations, administrative policy guidance, and case law. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996) (noting that "[w]hen evaluating credibility . . . the adjudicator must consider the entire case record"); *Lewis*, 858 F.3d at 865–66.  Having said this, the Court notes that no case in this circuit requires an ALJ to award bonus credibility points to a claimant based upon a solid and lengthy work history. *See, e.g., Brooks v. Colvin*, No. 1:12cv189, 2013 WL 5302566, at *5 (W.D.N.C. Sept. 19, 2013) (stating that the Fourth Circuit does not recognize "an enhanced credibility doctrine" based upon a claimant's extensive work history).    Indeed, requiring the assignment of extra weight to such a single factor that may or may not be relevant in any given case, may well interfere with an ALJ's task to evaluate multiple factors in the entire case record when assessing the credibility of a claimant's statements about symptoms.  Inasmuch as it remains for the ALJ to review the entire case record and specify reasons for any credibility finding, the Court declines Lopez's invitation to pre-judge whether her past work history is relevant to such a determination.

## VI. <u>RECOMMENDATION</u>

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 11) be **GRANTED in part** and **DENIED in part** and the Commissioner's motion for summary judgment (ECF No. 13) be **DENIED**.

## VII. **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 7, 2018

44